MODIFIED: DECEMBER 20, 2017
RENDERED: DECEMBER 14, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000263-MR

JERARD GARRETT          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.         HONORABLE JAMES M. SHAKE, JUDGE
NOS. 13-CR-000246 AND 13-CR-000744

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Jerard Garrett appeals as a matter of right from a judgment of the Jefferson Circuit Court sentencing him to life in prison without the possibility of parole for twenty-five years for two counts of murder, two counts of first-degree robbery, one count of first-degree wanton endangerment, and one count of terroristic threatening. For the following reasons, we affirm the judgment and sentence.

## I. BACKGROUND.

In one indictment, a Jefferson County grand jury charged Garrett and his co-defendant, Billy Richardson, with one count each of murder, first-degree robbery, first-degree wanton endangerment, third-degree terroristic threatening, and being a first-degree persistent felony offender ("PFO1"), arising

from the murder of Jamie Young on December 29, 2012. In a separate indictment, the grand jury charged Garrett and Richardson with one count each of murder and first-degree robbery, arising from the murder of Kenny Forbes on December 23, 2012. Over Garrett's objection, the trial court consolidated the charges in the two indictments for trial. Pursuant to RCr[1] 6.18, the trial court found that the defendants' practice of scheduling meetings through a known intermediary to conduct a drug transaction, then robbing the victim, was sufficiently unique to warrant joinder of the charges and consolidation of the indictments. Garrett now challenges this decision of the trial court, as well as several of its other decisions. We do not find any of Garrett's challenges to have merit.

## II. ANALYSIS.

### a. The Trial Court Did Not Abuse Its Discretion by Admitting the Commonwealth's Ballistics Evidence.

Garrett suggests, as a general matter, that an opinion from a firearm and toolmark examiner that a particular bullet was fired from a particular gun should no longer be admissible in criminal trials in Kentucky. We note that ballistics testimony has been allowed by this Court since at least 1948. *Morris v. Commonwealth*, 306 Ky. 349, 208 S.W.2d 58 (1948). Still, Garrett argues that the methodology and reliability of the Commonwealth's ballistic examiner's testimony that bullets found at both murder scenes were fired from the same

---

[1] Kentucky Rules of Criminal Procedure.

2

weapon did not meet the criteria set forth in KRE[2] 702 for admissibility, and therefore should not have been admitted. After conducting *Daubert*[3] hearings on the admissibility of testimony from the Commonwealth's Kentucky State Police ("KSP") firearms expert, Leah Collier, and Garrett's expert, William Tobin, a forensic metallurgist materials scientist who worked for the FBI for 27 years, the trial court concluded that both experts' testimony would be admissible.

This Court reviews a trial court's ruling on the admissibility of expert testimony for an abuse of discretion unless the challenge is to the trial court's findings of fact regarding the *Daubert* factors, which we review for clear error. *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky. 2004). Because Garrett challenges the trial court's preliminary factual determination as to the reliability of ballistic evidence under *Daubert*, we review for clear error.

*Daubert* assigns the trial court the role of "gatekeeper" charged with preventing the admission of unreliable, pseudoscientific evidence:

> [T]he trial judge must determine at the outset ...
> whether the expert is proposing to testify to (1)
> scientific knowledge that (2) will assist the trier of fact
> to understand or determine a fact in issue. This entails
> a preliminary assessment of whether the reasoning or
> methodology underlying the testimony is scientifically
> valid and of whether that reasoning or methodology
> properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592–93, 113 S.Ct. at 2796 (footnote omitted); KRE 702.

---

[2] Kentucky Rules of Evidence.

[3] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

3

The trial court may consider the following factors in assessing the reliability of expert testimony:

> (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

*Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578–79 (Ky. 2000) (citing *Daubert*, 509 U.S. at 592–94, 113 S.Ct. at 2796–97). "In addition to being reliable, the proposed testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. This condition goes primarily to relevance." *Miller*, 146 S.W.3d at 914 (internal quotations and citation omitted).

Garrett maintains that the scientific community has attacked and refuted the reliability of the premises and methods of specific source attribution in ballistics' analysis, thus rendering Collier's testimony incompetent. In support of his position, Garrett primarily relies on a 2009 National Research Council's report titled *Strengthening Forensic Science in the United States: A Path Forward* ("NRC Report"), which calls into question the validity of the assumptions about toolmarks that underlie firearms identification. However, the Association of Firearm and Toolmark Examiners ("AFTE") theory of identification, which Collier testified she utilized and which the federal courts have recently held satisfies *Daubert*, permits a conclusion

4

that two or more bullets are of common origin "when the microscopic surface contours of the toolmarks are in sufficient agreement." *United States v. Otero*, 849 F.Supp.2d 425 (D.N.J. 2012), *aff'd* 557 Fed. Appx. 146 (3rd Cir. 2014).

In *Otero*, the defendants sought to exclude the testimony of the government's firearms examiner that a bullet was discharged by a specific weapon. 849 F.Supp.2d at 427. The *Otero* court recognized that the AFTE theory of identification innately contains a subjective component in determining "sufficient agreement" which "must necessarily be based on the examiner's training and experience." *Id.* at 432. In assessing the admissibility of the firearm examiner's testimony, the *Otero* court meticulously analyzed the *Daubert* factors and found the proffered testimony satisfied each one. *Id.* at 431–435.

Specifically, the *Otero* court found that "the AFTE theory is testable and has been tested." *Id.* at 432. The court acknowledged the same NRC Report, upon which Garrett relies, and found that while the toolmark identification procedures "do indeed involve some degree of subjective analysis and reliance upon the expertise and experience of the examiner" the methodology is reliable. *Id.* at 438. Garrett points to the *Otero* court recognition that "claims for absolute certainty as to identifications made by practitioners in this area may well be overblown" to argue that Collier's identification of the bullets improperly amounted to absolute certainty, as opposed to a reasonable degree of certainty. *Id.* However, our review of the record shows that Collier testified that she examined the two bullets from this case visually and microscopically and

5

"made the determination that they were fired from the same firearm." Collier went on to testify that bullet condition can vary. She stated that while bullet condition runs the full range, even completely mutilated, the bullets in this case were in very good condition. Assessing Collier's conclusion that the bullets were fired from the same gun in the context of her entire testimony, which reflects the varying condition of bullets and her subjective experience analyzing them, we do not believe her testimony amounted to "absolute certainty" so as to require exclusion. Rather, we believe the jury was charged with assessing the reliability and credibility of her opinion, given all the evidence presented.

We agree with the *Otero* court's application of the *Daubert* factors to ballistics testimony such as that at hand, and with the trial court's analysis of the *Daubert* factors and ultimate decision to admit Collier's testimony. The proper avenue for Garrett to address his concerns about the methodology and reliability of Collier's testimony was through cross-examination, as well as through the testimony of his own expert. In this way, the jury was presented with both parties' positions, and with any limitations to the testimony, and charged with weighing all the evidence presented.

### b. The Trial Court Did Not Abuse Its Discretion by Joining the Offenses for Trial.

Garrett argues that the trial court abused its discretion by joining the Forbes and Young murder charges together for a single trial because the murders were not sufficiently similar in character, and therefore did not meet the common scheme and plan rubric of RCr 6.18.

6

The interaction of RCr 9.12 and RCr 6.18 allows the charges brought in separate indictments to be joined for trial only when the offenses are "of the same or similar character" or are "based on the same acts or transactions connected together or constituting parts of a common scheme or plan." When the conditions set forth in RCr 6.18 and RCr 9.12 are present, the trial judge has broad discretion to allow the joinder of offenses charged in separate indictments. We review such decisions for abuse of discretion. Nevertheless, to be reversible, an erroneous joinder of offenses must be accompanied by "a showing of prejudice" to the defendant. This showing of prejudice cannot be based on mere speculation, but must be supported by the record.

\* \* \*

[A] significant factor in identifying prejudice from joining offenses for a single trial is the extent to which evidence of one offense would be inadmissible in the trial of the other offense.

*Hammond v. Commonwealth*, 366 S.W.3d 425, 428–29 (Ky. 2012) (internal citations and footnote omitted).

Because a defendant is prejudiced simply by being tried at all, a defendant is required to show prior to trial that he would be "unfairly prejudiced" by a joinder. *Parker v. Commonwealth*, 291 S.W.3d 647, 656–57 (Ky. 2009).

Offenses closely related in character, circumstance[,] and time need not be severed. If evidence from one of the offenses joined in the indictment would be admissible in a separate trial of the other offenses, the joinder of offenses generally will not be prejudicial. Additionally, considerations of judicial economy and the efficiency of avoiding multiple trials are reasons for joint trials.

7

*Cohron v. Commonwealth*, 306 S.W.3d 489, 493–94 (Ky. 2010) (footnote omitted); *see also Peacher v. Commonwealth*, 391 S.W.3d 821, 836 (Ky. 2013) (discussing the liberal joinder of offenses considering the advantages of joint trials).

Garrett emphasizes the differences between the crimes: the murders occurred six days apart, in different parts of the city; no connection existed between the victims; one murder occurred inside a car in a parking lot in the middle of the afternoon; the other murder took place in a residence during the evening; and no common witnesses to the two murders were identified. Thus, Garrett asserts that joinder was improper since no nexus or relationship exists between the two murders, nor a common plan or scheme.

The trial court found that the two murders and robberies were part of a common scheme: in both cases, the same two co-defendants were charged with murder and robbery after they arranged with the victims to purchase drugs; both victims were shot during the drug transactions; ballistics examination concluded that the bullets from both murders were fired from the same gun; and both sets of offenses occurred within six days of each other in the same city. Accordingly, the trial court concluded that the crimes committed were closely related in character, circumstance, and time, and were sufficiently similar to permit joinder under RCr 6.18. Under these circumstances, we do not believe the trial court abused its discretion by joining the offenses for trial, or that Garrett has identified "unfair prejudice" connected with the joinder sufficient to require a new trial.

8

### c. The Trial Court Properly Permitted a Witness to Make an In-Court Identification of Garrett.

Garrett asserts that the trial court abused its discretion by overruling his objection to witness Jamie Quisenberry making an in-court identification of him as the one who shot Young. He argues that because Quisenberry was unable to identify him in a photographic lineup five days after the shooting, Quisenberry should not have been allowed to make an in-court identification under application of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

We review a trial court's evidentiary rulings for an abuse of discretion. *Goodyear*, 11 S.W.3d at 577. An abuse of discretion occurs if the trial court's ruling is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Garrett's argument is not well taken. After appellate briefs were submitted in this case, this Court issued an Opinion in *Fairley v. Commonwealth*, 527 S.W.3d 792 (Ky. 2017), rejecting the very claim Garrett now presents. In *Fairley*, we held that the witness's inability to identify the defendant in a photographic lineup did not bar him from making an in-court identification:

> [T]he proper course is to permit the witness to attempt to identify the suspect in court and, if an identification is made, allow the defense to thoroughly cross-examine the witness concerning his failure to make a prior identification. The jury is fully capable of determining what weight to assign to the in-court identification. . . . Accordingly the trial court did not

9

> abuse its discretion in permitting the introduction of
> this evidence.

*Id.* at 797.

In *Fairley*, we also rejected the defendant's assertion that the witness's in-court identification should have been analyzed by the trial court under the factors set forth in *Biggers* before allowing the witness to testify. *Id.* at 798. "In *Biggers*, the Supreme Court set forth a two-prong due process test for considering an identification by a witness following impermissible suggestive pretrial procedures such as a photo array or line-up." *Id.* at 797–98. We expressly declined to extend *Biggers* to in-court identifications when no unduly suggestive pretrial behavior has been alleged; "'a primary aim of the *Biggers* line of cases was deterrence of law enforcement's use of improper lineups, showups, and photo arrays, a factor clearly not present in the case before us.'" *Id.* at 799 (citation omitted).

Garrett has not suggested that the photographic lineup presented to Quisenberry was unduly suggestive, or alleged any other improper pretrial procedures; rather, Garrett argues that the in-court identification by a witness who did not make an identification previously is unduly suggestive. This reasoning does not trigger application of *Biggers*, and is unsupported by Kentucky case law. The trial court followed the proper course of action by allowing Quisenberry to make an in-court identification, allowing Garrett the opportunity to cross-examine him, and letting the jury assess Quisenberry's credibility and weigh the evidence presented.

10

**d. Detective Guffy Did Not Improperly Bolster His Own Credibility by Answering Questions from Co-Defendant's Counsel on Cross-Examination.**

Garrett alleges that the trial court improperly allowed Det. Guffy to bolster his credibility during co-defendant Richardson's cross-examination of him, over Garrett's objection. We review the trial court's ruling for an abuse of discretion. *Goodyear*, 11 S.W.3d at 577.

During Garrett's cross-examination of Det. Guffy, Garrett's counsel questioned him vigorously regarding the phone call Det. Guffy testified he received from Garrett's older brother, Jermaine Garrett, after the murders, in which Jermaine informed Det. Guffy that the last phone number Forbes called before his death, 419-262-5824 ("the 419 number"), belonged to Garrett. Garrett's counsel implied that Det. Guffy was not being truthful about receiving the phone call from Jermaine because he did not swiftly record it in an investigative letter. Det. Guffy testified that three months after his conversation with Jermaine, he recorded in an investigative letter, "I spoke with a person later identified as a family member of Jerard Garrett, from phone number 502-471-8873. This conversation assisted in the verification of number 419-262-5824 as being the number associated with Jerard." Det. Guffy further testified that no police policy mandates that investigative letters be recorded within a specified time frame, or contain specified information.

During co-defendant Richardson's cross-examination of Det. Guffy, Richardson's counsel followed up on the line of questioning regarding Det. Guffy's truthfulness, to which Det. Guffy responded that he did his work as

11

diligently, as honestly as he could, and that he found any suggestion he was dishonest to be distasteful. At this point, Garrett's counsel objected, arguing that Det. Guffy's testimony constituted improper self-bolstering.

The law is well established that "[a] witness is not permitted to bolster her own testimony unless and until her credibility has been attacked." *Tackett v. Commonwealth*, 445 S.W.3d 20, 32 (Ky. 2014). As the Commonwealth points out, though, Garrett plainly attacked Det. Guffy's credibility during his cross-examination of him, insinuating that he was lying and committing perjury. Garrett put Det. Guffy's credibility squarely at issue, thus allowing it to be bolstered by Richardson's counsel during his cross-examination of Det. Guffy. Accordingly, the trial court did not abuse its discretion by overruling Garrett's objection to Det. Guffy's testimony.

### e. The Commonwealth's Use of the CourtNet Information Was Not Improper.

Garrett contends that he should be granted a new trial because the Commonwealth's use of a CourtNet printout to impeach Jermaine prejudiced Garrett and denied him the right to a fair trial. Whether Jermaine lived at 426 South 12th Street in 2012 was relevant because a call was placed from the number associated with that address, 502-471-8873 ("the 502 number"), to Det. Guffy after the murders, during which Det. Guffy testified that Jermaine identified the 419 number as belonging to Garrett. Det. Guffy had left a voicemail at the 502 number after obtaining Forbes' cellphone records and discovering that the last two calls Forbes placed before his death were to the 419 number. Det. Guffy obtained the call log for the 419 number and left

12

voicemails with the most recent numbers called, including the 502 number. He testified that he received a call back from the 502 number, and that the caller identified himself as Jermaine, who said the 419 number belonged to Garrett.

At trial, the Commonwealth sought to link Jermaine with the 502 number, and the phone call made to Det. Guffy, by showing that he resided at 426 South 12th Street around the time of the murders. Jermaine testified that he did not remember his phone number from 2012, denied having spoken with Det. Guffy after the murders, denied telling Det. Guffy that the 419 number belonged to Garrett, and said he never lived at 426 South 12th Street. The Commonwealth then presented him with a CourtNet printout of a district court misdemeanor showing Jermaine's listed address as 426 South 12th Street in 2012. Over Garrett's objection that the CourtNet document was unreliable, the trial court permitted the Commonwealth to show it to Jermaine and ask if the address listed on the CourtNet document, 426 South 12th Street, was his address in 2012. The document was not admitted into evidence or otherwise shown to the jury. We review the trial court's ruling for an abuse of discretion. *Goodyear*, 11 S.W.3d at 577.

> CourtNet is a product that is compiled by the Administrative Office of the Courts (AOC) that is generally useful for investigation into a person's background, but it is not intended as an official record of that background. In fact, CourtNet's user agreement states that the AOC "*CANNOT GUARANTEE* the accuracy of information obtained via CourtNet." Criminal Justice Agency, CourtNet Individual User Agreement, http://courtnet.kycourts. net/courtnet/manuals/CourtNetCJIndividual.pdf. It

13

> further states that "[d]ata obtained from this system is not an official court record" and that "[i]nformation received from CourtNet ... may not at any particular moment reflect the true status of court cases." *Id.*

*Finnell v. Commonwealth,* 295 S.W.3d 829, 834 (Ky. 2009).

In *Finnell,* this Court disapproved of the use of a CourtNet document to prove a defendant's prior convictions during the sentencing phase of trial. *Id.* In that case, the Commonwealth introduced into evidence, and spent over eight minutes reading from, ten pages of a CourtNet printout listing Finnell's 14 prior misdemeanor convictions, including one felony that it had already introduced by testimony from a certified copy of the judgment. *Id.* at 834. We reversed and remanded for a new sentencing phase on the following grounds:

> CourtNet is not an appropriate document to use to influence a jury's decision on fixing a penalty. It lacks the requisite indicia of reliability necessary to reliably prove a defendant's prior convictions. To do that, the evidence of prior convictions must come from the official court record, or certified copies thereof. However, other elements of proof, such as proving a defendant's parole status or age, may be introduced through other appropriate records.

*Id.* at 835.

Relying on an unpublished decision from the Court of Appeals, *Merriweather v. Commonwealth,* No. 2011-CA-001398-MR, 2012 WL 6651882 (Ky. App. Dec. 21, 2012), Garrett argues that CourtNet documents should not be used to impeach a witness. In *Merriweather,* prior to the sentencing phase, the parties discussed introduction of the defendant's prior felony convictions for purposes of the PFO charge; the Commonwealth had certified documents relating to three prior felonies of the defendant, but only a CourtNet printout of

14

a fourth 1995 felony conviction. *Id.* at *3. The trial court determined that the CourtNet document was not reliable enough to be used for purposes of establishing a PFO charge and the parties agreed to remove the 1995 felony conviction from the PFO instructions. *Id.*

In *Merriweather*, on cross-examination of the defendant, the Commonwealth inquired into whether he had a 1995 felony conviction; defense counsel objected, arguing that the conviction was not to be mentioned. *Id.* at *4. The trial court overruled the objection and allowed the Commonwealth to ask the question; the defendant replied that he did not recall whether he had a felony conviction from 1995. *Id.* On appeal, the Court of Appeals held that no error occurred:

> In the case at hand, the Commonwealth sought to elicit testimony from Merriweather about his 1995 conviction for truth-in-sentencing purposes, not persistent felony offender purposes. The Commonwealth did not introduce the CourtNet document showing the 1995 conviction into evidence, it only used it as a basis to inquire from Merriweather as to whether the conviction existed. Had the Commonwealth sought to use the CourtNet document to impeach Merriweather, or tried to introduce it when Merriweather stated he did not remember a 1995 conviction, then that would have been improper. Unlike in *Finnell*, the Commonwealth in this case did not introduce the CourtNet document and its contents into evidence; therefore, there is no error.

*Id.* at *5.

Notwithstanding that *Merriweather* is not binding on this Court, or any other court since unpublished, we briefly note that the situation at bar is distinguishable in that the Commonwealth used the CourtNet document not to

15

prove Jermaine's criminal history or the status of a court case, but rather to confirm with Jermaine background information contained thereon: his name, date of birth, and address. Jermaine confirmed his name and date of birth as listed, but disputed the 426 South 12th Street address. Based on these facts, we believe the Commonwealth's use of the CourtNet printout did not run afoul of our holding in *Finnell,* or of the stated purpose of CourtNet identified in that case.

Further, even without use of the CourtNet printout linking Jermaine to that address and consequently to the 502 number associated therewith, Garrett was connected to the 419 number through the testimony of Det. Guffy, who stated that he received a call from Jermaine informing him that the 419 number belonged to Garrett. The jury was charged with assessing the credibility of the witnesses, and to weigh the evidence accordingly. Thus, even if we accepted Garrett's argument that error occurred, such error did not have substantial influence so as to require reversal under the harmless error standard. *See* RCr 10.26; *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky. 2009)[(the inquiry into whether a non-constitutional evidentiary error may be deemed harmless "is not simply whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.") (internal quotations and citations omitted)].

16

### f. No Cumulative Error Exists.

Garrett argues that he is entitled to relief on the basis of cumulative error, "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Since none of Garrett's alleged errors merit relief individually, they do not become meritorious when considered cumulatively.

### III.   CONCLUSION.

For the foregoing reasons, the judgment and sentence of the Jefferson Circuit Court is affirmed.

All sitting. Minton, C.J., Cunningham, Hughes, Keller, VanMeter, and Wright, J.J., concur. Venters, J., concurs in result only.

COUNSEL FOR APPELLANT:

Samuel N. Potter
Robert Chung-Hua Yang
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jason Bradley Moore
Assistant Attorney General

# Supreme Court of Kentucky

2016-SC-000263-MR

JERARD GARRETT                          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE JAMES M. SHAKE, JUDGE
V.           CASE NOS. 13-CR-000246 AND 13-CR-000744

COMMONWEALTH OF KENTUCKY           APPELLEE

## ORDER

On the Court's own motion, this Court hereby modifies the Opinion of the Court by Justice VanMeter rendered December 14, 2017 in the above styled case by the substitution of a new opinion as attached hereto in lieu of the Opinion of the Court as originally entered. Said modification does not affect the holding, and is made only to reflect a typographical error on page 11 changing "Det. Duffy" to "Det. Guffy".

ENTERED: December 20, 2017

_____
CHIEF JUSTICE JOHN D. MINTON, JR.