RENDERED: JUNE 15, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0281-DG

VIVIANE RENOT                                                                 APPELLANT

V.
ON REVIEW FROM COURT OF APPEALS
NOS. 2020-CA-0227 & 2020-CA-0541
FAYETTE CIRCUIT COURT NO. 16-CI-01853

SECURA SUPREME INSURANCE                                          APPELLEE
COMPANY

**OPINION OF THE COURT BY JUSTICE NICKELL**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

Viviane Renot was allegedly injured in a motor vehicle collision on November 26, 2013, in Fayette County, Kentucky. She subsequently filed a direct action against her underinsured motorists' ("UIM") carrier, Secura Supreme Insurance Company ("Secura"). Following trial, the jury returned a verdict in favor of Secura. Renot appealed and the Court of Appeals affirmed. We granted discretionary review. After a careful review, we affirm in part, reverse in part, and remand for a new trial.

## I.  FACTS AND PROCEDURAL HISTORY

On the day of the collision, Renot was stopped at a red light in her 2011 Mini Cooper. Carolyn Price was behind Renot in her 2011 Mazda CX-9 SUV. The pavement was wet and when Price attempted to stop, her vehicle began to

slide. She contacted the rear of Renot's vehicle. Renot has a very slight

stature and sits close to the dashboard while driving to allow her to reach the

pedals. When she was rear-ended, her right knee struck the dash or steering

column. The impact caused slight damage to Renot's vehicle and no

discernable damage to Price's vehicle. Prior to trial the parties stipulated Price

was fully liable for the collision.

After reporting no injuries at the scene of the collision, Renot first sought

medical treatment approximately six weeks later when she reported neck pain

she attributed to sleeping in an unusual position. No mention was made of the

collision. In early February of 2014—nearly ten weeks after the wreck—Renot

reported right knee pain, noting she felt a pop and sharp pain while at a

physical therapy session the previous day for her neck pain. Medical records

reflected a fall down some stairs in the weeks leading up to the February

appointment. Additional medical records revealed Renot had undergone a pre-

collision right knee arthroscopy and injection on October 3, 2013, to treat

preexisting arthritis.

Over the following two years, Renot underwent numerous surgical

procedures on her knees.[1] In March 2014, she had a right knee arthrotomy

with medial femoral condyle resurfacing. She developed an infection following

that procedure and underwent a right knee incision and drainage procedure

which required a lengthy hospital stay. In October 2014, Renot had a left knee

---

[1] Renot sought damages only for injuries to her right knee and made no claims related to her left knee or neck.

2

arthroscopy, debridement, meniscectomy, and chondroplasty. In March 2015, a total unilateral right knee replacement was performed.

Due to her ongoing knee problems, Renot incurred significant medical expenses, missed a substantial amount of work, and was forced to retire early from her position as a teacher in the Fayette County Public Schools. She attributed all of the foregoing to the November 2013 collision. Her treating orthopedic surgeon, Dr. Veronica Vasicek, opined the collision aggravated and exacerbated Renot's preexisting knee condition to the point where conservative treatment was no longer an option, and ascribed causation for the entirety of Renot's subsequent medical treatment on the right knee to the collision.

Renot filed the instant suit in May 2016 against Price and Secura as her UIM carrier, claiming Price was uninsured or underinsured, and that she had sustained in excess of $250,000 in damages related to the collision. Renot settled her claims against Price. Her UIM claim proceeded to a four-day jury trial commencing on November 18, 2019.

At trial, Secura presented independent medical expert testimony from Dr. Stacie Grossfeld, a physician, which contradicted the conclusions of Dr. Vasicek that Renot's post-collision surgeries were related to the accident. Dr. Grossfeld testified Renot suffered a contusion in the collision which would not necessitate the multiple surgeries which were subsequently performed. Rather, Dr. Grossfeld believed the advancement of Renot's preexisting osteoarthritis, and not an acute contusion, was the sole factor predicating the need for total knee replacement.

3

Secura also called biomechanical expert, David Porta, Ph.D., to testify regarding his biomechanical and anatomical opinions relative to the mechanism of injury in the collision. "Biomechanics is the application of engineering principles and methods to the study and solution of problems arising in biology and medicine." *Hallmark v. Eldridge*, 189 P.3d 646, 648 (Nev. 2008) (quoting 46 *Am. Jur. Trials* 638-39 (1993)). The focus of biomechanics is the study and evaluation of how various physical forces effect the human body.

Prior to trial, the trial court partially granted Renot's motion seeking to exclude Dr. Porta's testimony on the grounds he was not a medical doctor and was not qualified to opine regarding medical causation of any of Renot's injuries. However, the trial court determined Dr. Porta was qualified to offer expert testimony regarding forces, biomechanics, anatomy, and injury causation. In sum, Dr. Porta would be allowed to testify whether the injuries claimed by Renot were of the general type which could have been sustained in the collision but could not opine whether Renot's specific injuries were actually caused by the wreck. Even so, in his trial testimony, Dr. Porta offered relatively little information regarding biomechanical forces and generalized injury potentialities, but instead was permitted to embark on a wide-ranging review of Renot's medical history and to express his opinion that Renot's injuries were unrelated to the collision.

The jury returned a verdict in favor of Secura finding the collision had not been a substantial factor in Renot's injuries, including aggravation, arousal, or exacerbation of any preexisting condition. The trial court entered a

4

judgment conforming with the jury's verdict and assessing costs against Renot. Subsequent motions for a new trial, to alter, amend, or vacate the judgment and for a judgment notwithstanding the verdict were denied. After the Court of Appeals affirmed on Renot's direct appeal, we granted her motion for discretionary review. Additional facts will be developed as necessary.

Renot raises the same four allegations of error she brought in the Court of Appeals seeking reversal, all of which that court rejected. First, she contends the trial court erroneously permitted Dr. Porta to testify about medical questions beyond his qualifications. Second, Renot argues the trial court erroneously prohibited her from introducing evidence of what she believed were party admissions by Secura. For her final two allegations, Renot challenges the trial court's rulings related to juror selection and its failure to correct a juror's statement made during voir dire. We agree with Renot on her first allegation of error and conclude reversal and remand for a new trial is warranted. Because her second allegation of error may reoccur on remand, we will discuss it briefly. Renot's final two assertions are unlikely to reoccur and warrant no discussion.

## II. Analysis

### A. Dr. Porta's Testimony Was Improper

Renot asserts Dr. Porta was not qualified to testify because his opinions failed to satisfy the requirements contained in *Daubert v. Merrell Dow*

5

*Pharmaceuticals, Inc.,* 509 U.S. 579 (1993),[2] and KRE[3] 702.[4]  We disagree but nonetheless conclude his testimony went beyond the appropriate scope of his credentialed expertise.

Trial courts are charged to act as gatekeepers regarding expert opinions in order to prevent the admission of pseudoscientific, unreliable evidence. *Garrett v. Commonwealth,* 534 S.W.3d 217, 221 (Ky. 2017).  To fulfill this role, the trial court must undertake a two-part analysis wherein it must first assess whether the methodology or reasoning underpinning the proposed expert testimony has valid scientific reliability.  Second, the trial court must determine whether the expert's testimony will assist the trier of fact to understand a fact in issue.  *Daubert,* 509 U.S. at 592-93.

---

[2]  Although *Daubert* specifically applies to the application of Fed. R. Evid. 702 in actions in federal courts, Kentucky adopted its reasoning and standards for application of KRE 702, which contains language identical to its federal counterpart, in state courts in *Mitchell v. Commonwealth,* 908 S.W.2d 100 (Ky. 1995) (overruled on other grounds by *Fugate v. Commonwealth* 993 S.W.2d 931, 937 (Ky. 1999)).

[3]  Kentucky Rules of Evidence.

[4]  KRE 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case.

Appellate courts give great deference to trial court rulings related to expert testimony, reversing only when an abuse of discretion is clear. *Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 39 (Ky. 2004). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999). "An abuse of discretion exists only when we are 'firmly convinced that a mistake has been made.'" *Rossi v. CSX Transp., Inc.*, 357 S.W.3d 510, 515 (Ky. App. 2010) (quoting *Overstreet v. Overstreet,* 144 S.W.3d 834, 838 (Ky. App. 2003)). "Even then, reversal is unwarranted unless the error is not harmless; that is, unless corrected, the error would prejudice the substantial rights of a party." *Id.*

Here, after examining Dr. Porta's credentials[5] and a transcript of his pretrial deposition, the trial court determined he was qualified to provide biomechanical testimony regarding whether Renot's diagnosed injuries were of the type which might typically be expected to have arisen due to forces produced by the collision. However, because it was uncontroverted Dr. Porta was not a medical doctor and he was therefore unqualified to provide an opinion regarding a medical diagnosis or the medical causation of Renot's

---

[5] Dr. Porta is a professor at Bellarmine University, where he teaches anatomy and physiology. He is a member of the collaborating research faculty at the Virginia Tech-Wake Forest University Medical School Center for Injury Biomechanics. His research focuses on trauma biomechanics and injury reconstruction, and he has written numerous articles and abstracts on those subjects. He has authored five medical textbook chapters. Dr. Porta owns a forensic consulting company and has been retained as an expert witness in approximately 950 cases. Importantly, Dr. Porta is not a medical doctor.

injuries, the trial court ruled Dr. Porta was prohibited from providing such testimony.

Our review of the record reveals no error in the trial court's conclusion that Dr. Porta's training and experience satisfied the requirements of KRE 702 to permit him to testify within his field of expertise—biomechanics.  The topics of Dr. Porta's proposed testimony were scientific in nature, he was eminently qualified in his field, and the testimony had the potential of assisting the jury in understanding the types of forces experienced in motor vehicle collisions and the potential effects on hypothetical occupants of the vehicles involved.  Thus, Dr. Porta could properly testify regarding the generalized mechanics of injury causation related to Renot's motor vehicle collision, limited to reviewing the mechanisms and forces typically anticipated to produce a particular injury.  We likewise agree with the trial court's determination Dr. Porta was not qualified to offer medical causation testimony as he was not a medical doctor and his expertise in biomechanics and anatomy did not qualify him to testify about the medical cause of Renot's specific injuries.  Thus, there was no abuse of discretion in the trial court's pretrial determinations.

Further, the trial court's rulings are in conformity with *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299 (6th Cir. 1997), *abrogated on other grounds by Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500 (6th Cir. 1998), the leading case involving biomechanical expert testimony.  In *Smelser*, a biomechanical expert was held to be qualified to provide an opinion regarding the forces generated in a collision and the types of injuries typically resulting

8

from those forces.  *Id.* at 305.  However, because biomechanical experts are not medical doctors, it was held they "are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces, but are not qualified to render medical opinions regarding the precise cause of a specific injury."  *Id.*

Although *Smelser* dealt with a biomechanical engineer, we find its logic persuasive and applicable to the instant matter, and hereby adopt its sound reasoning as our own.  We similarly hold a qualified biomechanical expert may be utilized at trial to support or discredit a physician's medical conclusions concerning causation by offering objective, scientifically based testimony regarding the likelihood or probability that a particular traumatic incident could or would normally be expected to have produced or resulted in a specific medical injury or condition.  However, a biomechanical expert may not invade the province of a physician's absolute authority by conclusively opining whether the traumatic incident at issue did or did not, in fact, cause the medically diagnosed injury or condition of a particular plaintiff.  Though a biomechanical expert may possess the education and training necessary to provide science-based data and statistical information tending to confirm or impeach medical causation as determined by physicians, they are not qualified nor authorized to reach a medical diagnosis or offer their own analogous or antithetical medical conclusions regarding causation based on such information.

> To be admissible, biomechanical opinions need to fall into a "Goldilocks zone" of their own.  Attorneys seeking to offer the

9

testimony of an expert in the field of biomechanics who is not a physician must ensure that their expert's proffer is not too specific, wandering into the realm of medical causation, or too general, not helping a lay jury. A biomechanical expert who is not a medical doctor must find the middle ground that is "just right" for the opinions to be admissible.

Holly M. Polglase and Matthew E. Brown, BEYOND PORRIDGE The "Goldilocks Zone" for Biomechanical Opinions, 61 No. 11 DRI For Def. 46 (2019). Ultimately, of course, it is for the trier of fact to weigh medical opinions expressed by qualified physicians to determine whether a specific traumatic incident caused or contributed to a claimant's physical condition.

Based on the foregoing, we discern no error in the trial court's pretrial rulings. However, we hold the trial court erroneously allowed Dr. Porta's trial testimony to contravene its own pretrial rulings. Over multiple objections, Dr. Porta was permitted to offer testimony on behalf of Secura regarding the cause of Renot's right knee condition. Such testimony crossed over into medical causation testimony and impermissibly invaded the province of physicians.

For example, on direct examination, citing no supportive scientific studies or data regarding the effect of traumatic impacts on arthritic knees and claiming no specialized knowledge, Dr. Porta offered numerous opinions relating to Renot's injuries and their etiology. In so doing, he specifically disagreed with and discounted medical opinions expressed by licensed physicians, instead opining Renot's specific injuries could not have resulted from the collision.

More particularly, in addition to speculating Renot's knee injury could have been caused by a fall down some stairs and that neck injuries sustained

in low-speed car collisions should resolve within five weeks, Dr. Porta was erroneously allowed to testify that Renot's:

- failure to request an ambulance or visit the emergency room immediately after the collision led him to conclude the knee injury was unrelated to the crash.

- delay of five weeks prior to seeking any treatment was "an awfully long time to go without treatment," leading him to conclude the knee injury was not caused by the collision.

- inconsistent post-accident complaints convinced him the collision and knee injury were unrelated.

- "long history of knee issues" likely caused her current knee pain.

- genetics and advancing age made it "pretty clear" she is "one of those people unfortunately" suffering from accelerated osteoarthritis which preexisted the collision.

- medical records disclosed physical processes which "are not things that happen overnight" but develop "over a long time."

During his testimony, Dr. Porta used an exemplar knee to explain the various knee conditions discussed in Renot's medical records. Secura also utilized Dr. Porta to admit medical records and explain Renot's medical history. None of this testimony referenced biomechanics or otherwise implicated Dr. Porta's expertise.

Though admitting, "I'm no physician," Dr. Porta did not hesitate to opine "when I saw the first complaint was ten weeks later and there was no mention of the accident, they did not appear related to me." And while making a cursory reference to a biomechanical absence of "sufficient force," he provided an unauthorized medical opinion regarding causation when he testified "I don't see any relation between this accident" and Renot's physical condition. Dr.

11

Porta proceeded to exclude any possibility of medical causation when he testified that any bruising sustained in the collision was incapable of impacting

> any of the deeper structures, and certainly not the cartilage inside of here, what you're seeing is bare bones [holding and pointing to exemplar knee], but there's an awful lot of tissue still over top of this, there's tendons we don't see at all, there's fat, there's skin. So, bruise to the area, no problem, that's certainly possible. But I don't see any force for deeper tissue injury.

This testimony exceeded Dr. Porta's well-established qualifications as a biomechanical expert and erroneously invaded the exclusive province of medical doctors in determining medical causation. Further, Secura compounded the error in allowing Dr. Porta's unqualified medical testimony when it repeatedly heralded his opinions and testimony during closing, essentially holding him out to be an "irrefutable causation master" whose unqualified opinions should be held in a higher regard than those of the medical professionals involved in this matter.

On the contrary, Dr. Porta's lack of appropriate medical credentials should have prohibited him from testifying regarding the presence or absence of any specific and concrete causal connection between the forces incurred in the subject low speed rear-end collision and Renot's medically diagnosed conditions. Here, the trial court correctly so held prior to trial, but then inexplicably and erroneously permitted such testimony at trial. This failure to follow its own well-founded mandate constituted an abuse of discretion. The biomechanical expert testimony regarding medical causation offered by Dr. Porta should have been disallowed and the error cannot be deemed harmless. The Court of Appeals erred in holding otherwise.

12

Just as in *Rossi*, the separation between "injury causation" and "medical causation" must be maintained and biomechanical experts must, by necessity, be required to limit their testimony only to their field of expertise. 357 S.W.3d at 514 (holding although an expert may have impressive and uncontroverted credentials on risk factors for developing an injury, lack of a medical degree prohibits the expert from giving causation testimony). In cases involving biomechanical experts who are not medical doctors, such testimony should be limited to the forces generated by the subject collision, the generally anticipated response of a hypothetical person's body to those forces, and the range of typical injuries resulting from such forces. Testimony regarding diagnosis of a specific medical condition associated with a traumatic injury sustained by a plaintiff or whether the trauma actually caused or exacerbated a plaintiff's injuries must be reserved for a medical doctor.

To be clear, while biomechanical experts may be qualified to testify about a typical or expected range of potential physical or medical outcomes resulting from the forces incurred in a collision or accident, they may not venture into the territory of medical causation, a province whose dominion is reserved to medical doctors alone. Reversal and remand for a new trial free from improper testimony are required.

### B. Exclusion of Alleged Party Admissions Was Proper

For her second allegation of error, Renot asserts the trial court erroneously granted Secura's motion in limine prohibiting any questioning or introduction of evidence regarding coverage or payments of personal injury

protection (PIP) or basic reparations benefits. She argues the ruling was in error because Secura's payment of PIP benefits operated as an admission or concession of a causative connection between the collision and her medical bills. Given that Secura subsequently "changed its mind" and contested her knee injury was not related to the collision, Renot contends she was entitled to introduce evidence of the prior concession. Alternatively, she asserts Secura "opened the door" to such testimony by claiming it had only paid for damages related to the accident. She contends the Court of Appeals erroneously rejected her arguments. We disagree.

As correctly noted by the Court of Appeals, payments of claims under a PIP policy differ significantly from those made under a UIM policy. PIP benefits are payable "without regard to fault." KRS[6] 304.39-040(1). Moreover, "[t]here is a statutory presumption that any medical bill submitted [by a PIP claimant] is reasonable." *State Auto Mut. Ins. Co. v. Outlaw*, 575 S.W.2d 489, 493 (Ky. App. 1978) (citing KRS 304.39-020(5)(a)). PIP benefits are the exclusive remedy for the first $10,000 in medical expenses or lost wages which are incurred by a no-fault plaintiff. *See Drury v. Spalding*, 812 S.W.2d 713, 716 (Ky. 1991). The General Assembly clearly intended PIP coverage

> to provide a remedy to automobile accident victims that could not be impinged upon by any means whatsoever. This was the victim's reward for sacrificing traditional tort rights. . . . It is remedial in nature and thus will be broadly construed to carry out its beneficial purpose of providing compensation for persons injured by automobiles.

---

[6] Kentucky Revised Statutes.

14

*Blue Cross and Blue Shield, Inc. v. Baxter*, 713 S.W.2d 478, 480 (Ky. App. 1986) (citations omitted).

Conversely, UIM benefits are provided as additional coverage under which an insurance company

> agrees to pay its own insured for such uncompensated damages as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of the other vehicle exceeds the liability policy limits thereon, to the extent of the underinsurance policy limits on the vehicle of the party recovering.

KRS 304.39-320(2). This "allow[s] an insured to purchase additional coverage so as to be fully compensated for damages when injured by the fault of another individual." *Nationwide Mut. Ins. Co. v. Hatfield*, 122 S.W.3d 36, 40 (Ky. 2003). Claimed medical expenses do not enjoy the presumption of reasonableness for UIM purposes as do those claimed under a PIP policy. Entitlement to UIM benefits requires the claimant to prove another motorist is a tortfeasor, the amount of damages sustained because of the tortfeasor's actions, and the extent of the tortfeasor's liability. *State Farm Mut. Auto. Ins. Co. v. Riggs*, 484 S.W.3d 724, 729 (Ky. 2016).

From the foregoing, it is clear PIP and UIM claims are separate and independent. They are not overlapping, nor do they provide duplicative coverage benefits for the same loss. Further, because PIP payments are made without regard to fault, such payments cannot be equated with an admission of a causal connection between an automobile collision and a claimed injury. Thus, as the Court of Appeals noted, evidence concerning PIP coverage or payments is simply irrelevant to any issue raised in this UIM action and is

15

therefore inadmissible. *See* KRE 401. Renot's assertions to the contrary are without merit.

We are likewise unpersuaded by Renot's assertion that Secura opened the door to admission of evidence of its prior PIP payments. During voir dire, Secura's counsel erroneously informed the jury that Secura had paid Renot for the damage to her vehicle when in actuality the total damage to Renot's vehicle did not reach the threshold of her deductible. When counsel was made aware of the mistake, it was brought to the attention of the trial court and an admonition was given to the jury. Subsequently, Renot argued that Secura's statements asserting it had paid for damage to her vehicle because "it was related" to the collision and that it had only made payments "for things which were related," opened the door to introduction of the PIP payments. As a result, she argued the PIP evidence became admissible as an admission or concession that Secura believed Renot's first surgery following the collision was "related" to injuries sustained in the wreck. The trial court and Court of Appeals correctly rejected her position.

Property damage was a collateral and immaterial issue at trial. The misstatement regarding payment for such damage was not inflammatory or highly prejudicial. The trial court's admonishment informed the jury the claim was unpaid because it was insufficient to reach Renot's deductible. Clearly, the trial court did not want the jury to entertain a false belief Secura was refusing to pay a claim for which it was obligated. Nothing about the property damage claim was relevant to any other disputed issue at trial including Price's

16

negligence, coverage under the UIM policy, the extent of Renot's injuries and associated medical expenses, or a causal connection between the claimed injuries and the collision. Secura simply did not open the door for entry of such evidence and no improper inferences were placed before the jury justifying the curative admissibility of the otherwise properly excluded evidence of PIP coverage and payments. There was no error as the Court of Appeals correctly held.

## C. Remaining Issues

As previously stated, because we are reversing and remanding for a new trial, we need not comment on Renot's allegations of error regarding jury selection and the failure of the trial court to correct a misstatement by a member of the venire. Such issues were limited to two specific members of the prospective jury panel and are unlikely to reoccur on remand. Nevertheless, we discern no error and affirm the Court of Appeals on those issues.

## III.   Conclusion

For the foregoing reasons, the decision of the Court of Appeals regarding Dr. Porta's testimony is reversed, and the matter is remanded for a new trial consistent with this opinion. The Court of Appeals is affirmed in all other respects.

Bisig, Conley, Keller, Lambert, Nickell, and Thompson, JJ., sitting. Bisig, Conley, Keller, and Lambert, JJ., concur. Thompson, J., dissents by separate opinion. VanMeter, C.J., not sitting.

17

THOMPSON, J., DISSENTING BY SEPARATE OPINION:

I respectfully dissent. Following a viewing of Dr. Porta's videotaped trial testimony, I cannot agree that his testimony had a substantial effect, if any, on the jury's determination given the cumulative nature of much of his testimony and the other evidence showing that Renot's knee issues were not related to the auto accident. Therefore, errors, if any, regarding the admission of portions of Dr. Porta's testimony were harmless.

Much of Dr. Porta's allegedly objectionable testimony (intruding into the realm of medical opinion) was actually elicited during a rigorous cross-examination. Dr. Porta himself actively resisted testifying outside of his realm of expertise. Additionally, I conclude the portions of Dr. Porta's testimony found to be objectionable, to be merely cumulative to testimony already advanced by Secura's own medical expert and supported by the medical record.

Viviane Renot suffered from preexisting osteoarthritis in her right knee. She had already undergone an arthroscopy and injection of her right knee prior to the low speed, minimal impact collision. She reported no injuries at the scene. She did not seek medical attention for her knee until nearly ten weeks after the auto accident and then reported falling down stairs in the weeks prior to her appointment.

With these facts, I do not believe Dr. Porta's testimony influenced the verdict and therefore dissent.

COUNSEL FOR APPELLANT:

Sandra M. Varellas
D. Todd Varelles
Preston P. Cahill
Varellas & Varellas


COUNSEL FOR APPELLEE:

Ashley K. Brown
Graham D. Barth
Ward, Hocker & Thornton, PLLC

COUNSEL FOR AMICUS CURIAE, KENTUCKY DEFENSE COUNSEL:
Charles A. Walker
Sewell & Neal, PLLC


COUNSEL FOR AMICUS CURIAE, KENTUCKY JUSTICE ASSOCIATION:
Kenneth Human
Hicks & Funfsinn, PLLC